Filed: June 14, 2007

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 05-4435(L)
(CR-03-309-G)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GREGORY LAMONT WILSON, a/k/a Nice

Defendant - Appellant.

O R D E R

Upon consideration of counsel for appellant Powell's request for modification of the Court's opinion, the court amends its opinion filed April 19, 2007, as follows:

On page 2, counsel information, line 8 -- the parenthetical "(appointed on appeal)" is inserted after "Washington, D.C."

For the Court

/s/ Patricia S. Connor

Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GREGORY LAMONT WILSON, a/k/a
Nice,
*Defendant-Appellant.*

No. 05-4435

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

EDWIN LLOYD MURRAY, a/k/a Gator,
*Defendant-Appellant.*

No. 05-4503

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

DERRICK LENWOOD POWELL,
*Defendant-Appellant.*

No. 05-4837

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(CR-03-309-G)

Argued: February 2, 2007

Decided: April 19, 2007

Before NIEMEYER, WILLIAMS, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Williams wrote the opinion, in which Judge Niemeyer and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Ann N. Sagerson, WILLIAMS & CONNOLLY, Washington, D.C., for Appellants. Martin Joseph Clarke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Thomas J. Saunders, Baltimore, Maryland, for Appellant Gregory Lamont Wilson; Peter Dennis Ward, Baltimore, Maryland, for Appellant Edwin Lloyd Murray; Philip A. Sechler, Amer S. Ahmed, WILLIAMS & CONNOLLY, Washington, D.C. (appointed on appeal), for Appellant Derrick Lenwood Powell. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

Gregory Lamont Wilson, Edwin Lloyd Murray, and Derrick Lenwood Powell appeal their convictions for conspiracy to distribute 5 or more kilograms of cocaine and 50 grams or more of cocaine base, in violation of 21 U.S.C.A. § 841(a) (West 1999 & Supp. 2006). Wilson also appeals his convictions under 18 U.S.C.A. § 924(c)(1)(A) (West 2000 & Supp. 2006) and 18 U.S.C.A. § 922(g)(1) (West 2000) for unlawfully possessing a firearm on September 14, 2002. Finding no reversible error, we affirm.

I.

On September 13, 2002, Baltimore County Police officers stopped a vehicle driven by Dieter Munz, a known drug dealer, for a minor

traffic offense. Upon searching Munz's vehicle, the officers found and seized plastic baggies containing crack cocaine and marijuana. Based on other evidence found in the vehicle that linked Munz's residence at the time to 8832 Tamar Drive, Apartment 302, in Howard County, Maryland (Tamar Drive apartment), officers obtained a search warrant and executed it at that location the following day.

At the Tamar Drive apartment, the police found various items that indicated that the occupants of the house were involved in the drug trade. In the master bedroom, the police discovered what they believed to be a "drug owe sheet," which is sometimes used by drug distributers to keep track of the amount of drugs that have been provided to customers on consignment. The "drug owe sheet" was in an envelope addressed to Appellant Wilson's girlfriend. Also in the master bedroom, the police discovered a loaded .45 caliber pistol, paperwork in Munz's name, a traffic violation in Wilson's name, a prisoner property inventory in Wilson's name, and a package of photographs with Appellant Powell's name on the front, as well as $3000 in cash. In the second bedroom, police recovered paperwork in Appellant Murray's name, ammunition, and over $11,000 in cash.

Four days after the search, while conducting surveillance of the Tamar Drive apartment, the police observed Wilson and Murray removing furniture from the building. When the detectives entered the apartment, they found a jacket with $2500 in the pocket, which Wilson claimed belonged to him.

The police began to monitor Wilson's movements, and on January 7, 2003, officers followed Wilson and Michael White to a gas station. At the gas station, they observed Wilson take money from an individual; White then handed the individual a white object slightly larger than the size of a golf ball. Because police had observed Wilson and White going in and out of an apartment on Wheatley Drive in Baltimore County (Wheatley Drive apartment), they executed a search warrant at that location shortly thereafter. When police searched the apartment, Wilson, White, and another individual were present, but the apartment was barely furnished. In one bedroom, police discovered a digital scale with cocaine residue, $1900 in currency, and paperwork in Wilson's name. In a second bedroom, police discovered paperwork in White's name, a loaded .44 caliber handgun, and

another digital scale with cocaine residue. In the kitchen, the police found pots and pans with crack cocaine residue and more paperwork in Wilson's name.

Around the time of the Wheatley Drive apartment search, Baltimore County police began using a confidential informant to make controlled cocaine purchases from Anderson Hicks, an indicted coconspirator who ultimately pleaded guilty and testified at trial against Appellants. By following Hicks, police learned that his supply source was at an apartment building at 4402 Old Court Road, Randallstown, Maryland. On one occasion, Hicks was seen driving there in a vehicle owned by Derrick Powell. On January 24, 2003, police set up surveillance inside an apartment unit in the building. After instructing an informant to order crack cocaine from Hicks, police observed Hicks entering Apartment A (Old Court Road apartment), the same apartment that Wilson had entered earlier. At approximately the same time, a man was observed leaving the apartment and going to his vehicle. This man is believed to have been Powell. Shortly thereafter, the police began their raid to arrest Hicks and his supplier. Upon seeing the formations of the raid, Powell used his cell phone to warn the coconspirators in the apartment.

When the police entered the building, they heard people running from Apartment A. Wilson and Hicks had fled the apartment and forced their way into Apartment F, where Hicks was arrested. Wilson was arrested after he jumped from the balcony. Murray was found in Apartment A and arrested. In Apartment A, the police found approximately 186 grams of crack cocaine, 248 grams of powder cocaine, a digital scale, sandwich bags, pots, a spoon, and a knife, all containing drug residue. Police also discovered two handguns.

Shortly thereafter, in February 2003, Baltimore County police joined with federal task force officers in an effort to investigate the Wilson organization. On April 17, 2003, the investigators applied for and received authorization to wiretap cellular telephones used by Wilson, Murray, and others. These recorded conversations would become a central facet of the Government's case at trial.

On July 3, 2003, Wilson, Murray, Powell, and other coconspirators were indicted in the District of Maryland and charged with conspiracy

to distribute 5 or more kilograms of cocaine and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Wilson was also charged with three counts of possession of a firearm in furtherance of a drug trafficking crime, and Murray with one count, in violation of 18 U.S.C. § 924(c)(1). In addition, Wilson was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 924(g)(1). Finally, both Wilson and Murray were charged with possession with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 841(a)(1).

On January 20, 2004, the trial began with jury selection; the trial spanned 33 days and ended on February 23, 2004. At trial, the Government's case-in-chief relied on numerous witnesses, including coconspirators who had agreed to cooperate as well as Government investigators. A brief summary of the testimony most pertinent to this appeal is provided below.

One of the Government's key witnesses was Anderson Hicks, the same man who led police to the stash apartment on Old Court Road. Hicks, who was testifying pursuant to a state plea agreement, stated that Murray had supplied him with cocaine and crack cocaine. Hicks testified that in February, 2002, he picked up crack cocaine from one of the apartments in the complex on Old Court Road. When Hicks arrived, Wilson, Powell, and Murray were all present. Hicks was told that the apartment belonged to Powell, while Murray and Wilson lived together at the Tamar Drive apartment. Hicks returned to the Old Court Road apartment every few weeks to resupply. On one occasion later that year, Murray told Hicks that he was too busy to sell to him so that Hicks should go to Wilson instead.

Hicks was arrested in July 2002. After his arrest, Murray and Wilson warned him to cease dealing for a while because the police would be looking at him closely. Regardless, Powell agreed to "take care" of Hicks by supplying him with crack cocaine on multiple occasions. (J.A. at 431.)[1] Thus, until his arrest at the Randallstown apartment on January 24, 2003, Hicks testified that he was supplied by Murray, Wilson, and Powell.

---

[1]Citations to the "J.A." refer to the joint appendix filed with this appeal.

Andre Clark also testified. Clark was a supplier to the conspiracy, and testified that he usually delivered an eighth or quarter kilogram of cocaine to Wilson and watched Wilson convert it into crack cocaine. Clark was eventually arrested while returning to Maryland from Georgia with a kilogram of cocaine, nine ounces of which was to be given to Wilson. The Government also called Mark Halley, who indicated that he supplied both Wilson and Murray with cocaine, and that Powell was occasionally with the men during their dealings.

The Government thereafter called Damon Thomas, who testified pursuant to a federal plea agreement. Thomas stated that he supplied fraudulent documents, such as pay stubs, employment verification letters, automobile tags, and identification documents to coconspirators. Thus, to make it appear that Wilson, Powell, and Murray were lawfully employed, Thomas provided them with fake pay stubs that allowed them to purchase vehicles and rent apartments. Thomas had also lived in one of the apartments at the complex on Old Court Road.

Finally, the Government called various law enforcement officers, including Detective Seabolt, who provided more testimony than any other Government witness. Seabolt testified about his role in the investigation of the conspiracy. Furthermore, he was called as an expert to decipher the intercepted communications that were recorded via wiretap. The communications were full of drug slang and street code, and the district court allowed Seabolt to testify — over the defense's objection — as an expert as to the meanings of various words used by the coconspirators. Seabolt was thus able to testify as a fact witness, as well as present to the jury what he believed to be the true meaning of various code words and slang used by Wilson, Murray, Powell, and others.

At the conclusion of the trial, the jury found the defendants guilty of conspiracy to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 841(a). Wilson was also found guilty of being in possession of a firearm in furtherance of a drug trafficking crime, being a felon in possession of a firearm, and possession with intent to distribute 50 grams or more of crack cocaine. Murray was found guilty of being in possession of a firearm in furtherance of a drug trafficking crime and possession with intent to distribute 50 grams or more of crack cocaine. Wilson was sentenced to 300 months' imprisonment;

Murray was also sentenced to 300 months' imprisonment; Powell was sentenced to 120 months' imprisonment.

Appellants timely appealed. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

Wilson, Murray, and Powell make a number of arguments on appeal. First, Appellants claim that the district court erred in allowing Seabolt to testify as an expert witness. Second, they contend that the district court erred in giving misleading jury instructions. Third, Appellants argue that the district court erred in not suppressing the wiretaps. Fourth, they contend that there was insufficient evidence to support a conviction for conspiracy. Finally, Wilson argues there was insufficient evidence to support his firearms convictions. We address these arguments[2] in turn.

## III.

At trial, Appellants objected to the qualification of Seabolt as an expert "in the field of investigating drug trafficking in the Baltimore metropolitan region." (J.A. at 515.) On appeal, they contend that Seabolt's methodology for translating drug codes was neither sufficiently explained nor reliable.

We review for abuse of discretion the district court's decision to admit expert testimony under Federal Rule of Evidence 702. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). A "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* Thus, "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Id.* at 158.

---

[2]Wilson also made arguments challenging his sentence. At oral argument, counsel waived these arguments because they were not beneficial to Wilson. We therefore do not address them.

The thrust of Appellants' argument is that Seabolt failed to explain adequately how his experience in the narcotics field supported the methodology used and the ultimate conclusions made concerning the coded language spoken in the recorded conversations. The Government, on the other hand, contends that "Seabolt was a highly experienced narcotics investigator who applied reasonable and reliable methods to help jurors identify and understand patterns of drug-related dialogue contained within seemingly convoluted and disjointed conversations." (Appellee's Br. at 14.)

Federal Rule of Evidence 702 serves as our guidepost. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rule "requires that the [expert] testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case." Fed. R. Evid. 702 advisory committee's note. But, "the test of reliability is flexible" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141-42 (internal quotation marks omitted).

We have little trouble concluding that the district court did not abuse its discretion in qualifying Seabolt as an expert. A district court's reliability determination does not exist in a vacuum, as there exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific. Purely scientific testimony, for example, is characterized by "its falsifiability, or refutability, or testability." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) (quoting K. Popper, *Conjectures and Refutations: The Growth of Scientific*

*Knowledge* 37 (5th ed. 1989)). Thus, such evidence is "objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication." Fed. R. Evid. 702 advisory committee's note.

Experiential expert testimony, on the other hand, does not "rely on anything like a scientific method." *Id.* But this does not lead to a conclusion that "experience alone — or experience in conjunction with other knowledge, skill, training or education — may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Id.* While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id.*

The advisory committee notes specifically consider testimony by a law enforcement agent concerning the use of code words in drug transactions:

> [T]he principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of *extensive experience* to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

*Id.* (emphasis added). Unsurprisingly, then, courts of appeals have routinely held that law enforcement officers with extensive drug experience are qualified to give expert testimony on the meaning of drug-related code words. *See, e.g.*, *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999) ("[I]t is well established that experienced government agents may testify to the meaning of coded drug language under Fed. R. Evid. 702."); *United States v. Griffith*, 118 F.3d 318, 321-22 (5th Cir. 1997) (holding that experienced narcotics officers may offer expert testimony with respect to "drug traffickers' jargon"); *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996) (holding

that an experienced officer was qualified to give expert testimony
concerning the "meaning of jargon and codewords" because his expe-
rience represented "the best education there is for this type of thing");
*see also United States v. Garcia*, 291 F.3d 127, 139 (2d Cir. 2002)
("Given the attempts of drug dealers to disguise the content of their
discussions as legitimate subject matters, courts may allow witnesses
to 'decipher' the codes drug dealers use and testify to the true mean-
ing of the conversations.").

Before the district court, Seabolt summarized his methodology. He
began by explaining that his experience and training in investigating
narcotics trafficking confirmed that drug dealers often use coded
words and phrases in describing their business. He then explained that
he listened to intercepted conversations to see if they contained words
that appeared to have dual meanings, as in, for example, a dictionary
meaning and a drug meaning. By listening to a number of drug-
related conversations in context, he was able to sometimes identify a
word pattern that led him to decipher the code. Accordingly, Seabolt
stated: "I . . . take everything that I have, my knowledge, the situation,
and that's how I form my opinion." (J.A. at 518.) More specifically,
he explained:

> It all depends on the situation. I mean, there's, obviously,
> there's a lot of words to mean one thing. So like I say, you
> take it into the context of what you're talking about. That's
> how you determine. . . . It all depends on the context of the
> call. You know, drug dealers use coded language. And the
> reason that they do that is because they don't want police
> involvement or police to know what they're talking about.
> . . . I take the person who's talking, the conversation. I take
> what has this person, what's the routine pattern of this per-
> son before and the pattern after. And that's how I make my
> determination. . . . [W]hen you hear [a] word time and time
> again . . . then there's a pattern that develops. And when that
> pattern develops, that ultimately shows you what they're
> talking about.

(J.A. at 518-519.)

Seabolt was a nine-year veteran of the Baltimore County Police
Department. He spent most of his career investigating narcotics traf-

fickers and had participated in hundreds of drug investigations and arrests. At the time of his testimony, he was a detective in the Central Narcotics Unit in Baltimore County. Seabolt had attended seminars and classes offered by the U.S. Drug Enforcement Administration (DEA), and part of his course training dealt with coded language. He was sworn in as a federal task force officer with the DEA. He stated that in the course of his extensive experience dealing with drug traffickers and confidential informants, he was able to learn to understand the vernacular used by drug traffickers.

Seabolt's extensive "experience" qualified him to testify as an expert based on his "specialized knowledge" of drug traffickers' coded vernacular. Fed. R. Evid. 702. "Because the primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony." *Gibbs*, 190 F.3d at 211; *see also Griffith*, 118 F.3d at 321 ("Drug traffickers' jargon is a specialized body of knowledge . . . ."); *United States v. Walls*, 70 F.3d 1323, 1326 (D.C. Cir. 1995) (holding that law enforcement agents' specialized knowledge of drug jargon would assist the jury's understanding of the evidence). Furthermore, Seabolt's general method and principles in applying his experience and specialized knowledge to decipher the conspiracy's drug vernacular were sufficiently reliable.[3]

---

[3]Appellants urge us to follow the Ninth Circuit's reasoning in *United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002), where the court held that an officer's interpretations were inadmissible because the interpretations were based on his belief of the defendant's guilt. *Hermanek* is inapposite to this case. The Ninth Circuit's holding was anchored by the officer's description of his methodology, which stated that he "interpreted such [code] words based on his knowledge of the defendants." *Id.* at 1096. Seabolt's methodology was meaningfully different, as he relied primarily on his experience in looking to the context of the jargon used in relation to the language surrounding the jargon and the speaker's use of such language in the past and future, as opposed to starting with an assumption that any uncertain word must be referring to drugs because he was listening to the conversations of drug dealers. Moreover, the Ninth Circuit recently explained that *Hermanek* does not stand for the broad proposition urged by Appellants. In *United States v. Decoud*, 456 F.3d 996 (9th Cir. 2006), the court held that the Government satisfied *Hermanek* when it set "forth the expert's experience" and explained "the expert's methodology for interpreting new encoded words." *Id.* at 1013-14.

This is not to say, however, that Seabolt's method and principles were always *applied* reliably to the facts of the case throughout the course of his expert testimony. *See* Fed. R. Evid. 702 advisory committee note ("So long as the principles and methods are reliable *and applied reliably* to the facts of the case, this type of testimony should be admitted." (emphasis added)). Because Appellants did not object to any specific instances where they believed Seabolt did not follow his stated methodology, we review for plain error their claims that some of Seabolt's specific testimony was erroneously admitted.

After allowing Seabolt to testify as an expert, the district court was careful to note that when Seabolt opined on the true meaning of a coded word, he would, of course, be required "to explain" the basis for his opinion. (J.A. at 524.) Nevertheless, over the course of Seabolt's testimony, there were instances where Seabolt offered his interpretation of the meaning of a conversation without offering any reliable explanation as to why he opined that the conversation meant what it did.

For example, after playing a recording in which Murray stated, "he take too long, I'm going to go see my other man, yo," (J.A. at 1725), Seabolt stated that he understood that expression to mean that if he "keeps on taking forever to supply him, that he's going to go to another supplier." (J.A. at 680.) This type of testimony, however, was unhelpful to the jury. *See United States v. Dicker*, 853 F.2d 1102, 1108 (3d Cir. 1988) ("Although courts have construed the helpfulness requirement of Fed. R. Evid. 701 and 702 to allow the interpretation by a witness of coded or 'code-like' conversations, they have held that the interpretation of clear conversations is not helpful to the jury, and thus is not admissible under either rule."). Seabolt was not so much interpreting the meaning of Murray's quoted language as he was adding language to it. The actual language used by Murray needed no translation; Murray was explaining that because someone was taking too long, Murray may be forced to go elsewhere.

It may have been the case that Murray's next sentence — "I'm trying to wait on him, cause I don't want him to get the shit and then don't get it" (J.A. at 1725) — made it clear to Seabolt that Murray was using the code "shit" to refer to drugs and that the word "man" referred to a supplier. But the Government never asked Seabolt about

the next sentence and he never explained its meaning, and without some further explanation about the importance of the context provided by that next sentence, Seabolt's translation of "man" to "supplier" was unreliable.

Although there are other instances in the record where Seabolt did not adequately explain the application of his methodology to a specific translation, it is clear that he applied his methods and principles reliably in the vast majority of his testimony. Consider, for example, a portion of a conversation recorded between Wilson and White:

> White:   You already get into the um, get your shop back on.
>
> Wilson:   Na, I don't . . . I don't even got no way to get into the kitchen at.
>
> White:   Oh all right.
>
> Wilson:   Hold on yo . . . What you on easy? You on easy hah.
>
> White:   Hah?
>
> Wilson:   You on easy hah . . .
>
> White:   Yeah, . . . I just gave Kenneth another two hundred dollars, so I need to get good.
>
> Wilson:   All right I got some change, like, I think it's like two, two of them, two, like two out of a ball, you know what I mean?

(J.A. at 1693.)

When questioned about this conversation, Seabolt explained that he believed that White was asking Wilson if he had a supply of drugs when he asked about getting his "shop back on." Seabolt then explained that "kitchen" is a word that would be heard in other con-

versations, and that it referred to a place where powder cocaine would be converted into crack cocaine. A brief discussion ensued concerning the need of a heat source to convert powder cocaine into crack cocaine. The Government then asked Seabolt what the phrase "what you on easy" meant. Seabolt responded, "Easy is a term used, you'll hear that again, as meaning that you're out of drugs." (J.A. at 637.) Seabolt likewise explained that the phrase "get good" would be heard again, and that it meant that White needed resupplying. Seabolt then explained that he was uncertain over the meaning of the phrase "another $200" and could not say that it was drug related. He also explained that although "a ball" referred to an eight ball, or 3.5 grams of cocaine, he could not say what specific amount was being discussed when Wilson stated he had some "change" or "like two out of a ball."

This example details how Seabolt's methodology was reliably applied in the vast majority of instances. In explaining his methodology, Seabolt stated that "when you hear [a] word time and time again . . . then there's a pattern that develops. And when that pattern develops, that ultimately shows you what they're talking about." (J.A. at 521.) When reviewing the recorded conversations, Seabolt repeatedly heard the terms "kitchen," "on easy," and "get good." By studying the context in which these phrases were used and the pattern of their use, Seabolt was able to decipher the words' meaning, as understood by the coconspirators. But when he was unable to say whether a word or phrase had a non-dictionary drug meaning, he candidly admitted as much.

So although the district court erred[4] in failing to exclude Seabolt's

---

[4]We note that Appellants deserve some of the blame for those rare instances where improper testimony slipped through the gate's cracks. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1999) (explaining that the Federal Rules of Evidence require district courts to perform their "gatekeeper" role in screening expert testimony). Appellants cite a number of instances in the record where they believe Seabolt offered unreliable testimony, but they did not offer any objections at trial to Seabolt's specific testimony.

When evidence is erroneously admitted at trial, a party must file "a timely objection or motion to strike . . . , stating the specific ground of

testimony when that testimony either interpreted language that needed no interpretation, or when Seabolt did not adequately explain his methodology in reaching a questionable interpretation, the net effect was harmless because the overwhelming majority of Seabolt's expert testimony was properly admitted, that properly admitted testimony was alone sufficient to show Appellants' guilt with respect to the conspiracy charges, and any prejudice that flowed from the limited amount of improper testimony was outweighed by Seabolt's properly admitted expert testimony and the corroborative testimony of coconspirators. We therefore conclude that even assuming that the district court's error was plain, the error did not affect Appellants' substantial rights. *See, e.g.*, *United States v. Olano*, 507 U.S. 725, 732 (1993) ("There must be an 'error' that is 'plain' and that 'affects substantial rights.'" (internal alteration omitted)).[5]

---

objection, if the specific ground was not apparent from the context." Fed. R. Evid. 103. Although Appellants objected to Seabolt's qualifications and to his methodology before he testified, the district court properly overruled those objections. But once Seabolt began his expert testimony, Appellants could have objected to specific instances where they felt his testimony impermissibly skirted away from his stated methodology or where it offered opinions that were not helpful to the jury. Beyond that, they could have attacked Seabolt's interpretations during cross examination.

[5]Appellants also argue that the district court erred in allowing Seabolt to testify as both a fact witness and an expert witness. Although we recognize that such dual witnesses could confuse the jury, *see United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996) ("[W]hen a police officer testifies in two different capacities in the same case, there is a significant risk that the jury will be confused by the officer's dual role."), the district court took adequate steps — including having Seabolt testify first as a fact witness and issuing a cautionary instruction to the jury — to make certain that Seabolt's dual role did not prejudice or confuse the jury. *See United States v. Parra*, 402 F.3d 752, 760 (7th Cir. 2005) ("The potential for prejudice in this circumstance can be addressed by means of appropriate cautionary instructions and by examination of the witness that is structured in such a way as to make clear when the witness is testifying to facts and when he is offering his opinion as an expert." (internal quotation marks omitted)). The district court therefore did not abuse its discretion. *See* Fed. R. Evid. 701 advisory committee's note ("The amendment does not distinguish between expert and law *witnesses*, but rather expert and lay *testimony*. Certainly it is possible for the same witness to provide both lay and expert testimony in a single case.").

## IV.

Appellants next contend that the district court committed prejudicial error when delivering three of its jury instructions. First, they argue that the district court erred by instructing the jury that it was "the only jury that has ever decided or will decide whether the government's carried its burden of proof." (J.A. at 1549.) Second, they argue that the district court failed to instruct the jury on all the elements of a conspiracy charge insomuch as the court's instructions presumed the existence of "an unlawful agreement." (J.A. at 1552.) Third, they argue that the district court narrowed the Government's burden of proof by providing examples of a conspiracy that closely resembled the facts of the case with respect to Powell.

Because Appellants failed to object at trial, we review the district court's jury instructions for plain error. *See United States v. Stitt*, 250 F.3d 878, 883 (4th Cir. 2001). Under plain error review, Appellants must show that (1) the district court committed error, (2) the error was plain, and (3) the error affected their substantial rights. *See, e.g., Olano*, 507 U.,S. at 732. If Appellants satisfy this three-part showing, "correction of the error nevertheless remains within our discretion, which we should not exercise unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hadden*, 475 F.3d 652, 670 (4th Cir. 2007). We conclude that Appellants cannot satisfy the first prong of the test because the district court did not err.

As to Appellants' first contention, they argue that by telling the jury that it was the only jury that would ever decide the question, the district court delivered something akin to an impermissible, i.e. coercive, *Allen* charge.[6] "[T]he principal concern that we have had with *Allen* charges is to ensure that they apply pressure to the jury in a way that preserves all jurors' independent judgments and that they do so in a balanced manner." *United States v. Hylton*, 349 F.3d 781, 788 (4th Cir. 2003).

---

[6]The term "*Allen* charge" stems from the Supreme Court's opinion in *Allen v. United States*, 164 U.S. 492 (1896), where the district court instructed the minority in a deadlocked jury to consider whether the majority was correct.

When examining the entirety of the disputed instruction, however, it is clear that the district court was not attempting to coerce the jury into reaching a unanimous verdict, and no reasonable juror would have felt pressured by the instruction:

> You will get the indictment. The indictment, it's important to emphasize, is no evidence. It is the accusation. And you can look at it to see what the accusation is. That's all it is. The government took the proper procedural steps to get here. This is the only trial there's ever been. This is the only jury that has ever decided or will decide whether the government's carried its burden of proof.

(J.A. at 1549.) Nothing in this charge urges — let alone coerces — the jury toward unanimity, nor does the charge even address the possibility of a mistrial. Rather, it is simply an awkward attempt by the district court to explain to the jury that as *the jury*, they alone must decide whether the Government met its burden of proof.

Appellants' second contention involves the following instruction:

> Well, what does the government have to prove to establish guilt on [the conspiracy charges]? They must establish the following essential elements beyond a reasonable doubt. One is that at least two or more persons entered the unlawful agreement charged in the indictment. And two, that each defendant knowingly and willfully became a member of the conspiracy. Let me address those two points, and then there's some other points that I will also mention.

(J.A. at 1552.) Appellants argue that this instruction "failed to instruct the jury that they must determine beyond a reasonable doubt whether an unlawful agreement existed at all." (Appellant's Br. at 29.)

Appellants' argument, however, fails to view the instruction in context. Courts have repeatedly held that jury instructions "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation marks omitted);

*see United States v. Hsu*, 364 F.3d 192, 204 (4th Cir. 2004) ("To determine whether jury instructions require reversal, however, we assess the instructions as a whole and view them in context.").

Immediately after it gave the above instruction, the district court explained to the jury that the Government had to prove beyond a reasonable doubt that "two or more persons entered into the unlawful agreement charged in the indictment." (J.A. at 1553.) The court thereafter instructed the jury what it may consider "*in determining whether an agreement existed here*," and that it was the Government's burden to prove that there was a "mutual understanding" between two or more people to accomplish an unlawful act. (J.A. at 1553 (emphasis added).) Looking at the instructions in context, then, Appellants' argument is without merit.

Finally, Powell argues that the district court erred in instructing the jury that participation in a conspiracy could be proven, in part, by showing that an individual "alert[ed] coconspirators to the presence of law enforcement agents in certain areas." (J.A. at 1556.) Powell urges a novel claim that this instruction was error because it closely resembled some of Powell's alleged actions that were put forth at trial. Powell cites no caselaw for this proposition, and it is without merit. The court was careful to point out that mere presence or association was insufficient to prove knowing participation in a conspiracy, and the court continually reminded the jury that an individual's participation must be knowing and willful. Thus, just as it was not error for the court to explain that the storing or selling of drugs in connection with the conspiracy could prove participation, the challenged instruction was likewise not in error.

V.

Appellants next argue that the district court erred in not suppressing evidence obtained from the wiretaps. They contend that the wiretaps were not necessary under 18 U.S.C.A. § 2518(3) (West 2000) because the Government had previously been highly successful in its use of normal investigative procedures.

We review for clear error the factual findings underlying a district court's ruling on a motion to suppress, and we review the court's

legal conclusions de novo. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We previously have declined to specify a standard of review when confronted with an authorizing court's determination of necessity under § 2518(3). *See United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994) (declining to identify the appropriate standard of review). We now hold that we review for abuse of discretion determinations of necessity under § 2518. *See United States v. Bennett*, 219 F.3d 1117, 1121 (5th Cir. 2000) ("We review for abuse of discretion an issuing judge's decision that a wiretap was necessary."); *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same); *United States v. Phillips*, 959 F.2d 1187, 1190 (3d Cir. 1992) (same); *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (same); *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985) (same). *But see United States v. Vanmeter*, 278 F.3d 1156, 1163 (10th Cir. 2002) (de novo review); *United States v. Green*, 40 F.3d 1167, 1172-73 (11th Cir. 1994) (clear error review); *United States v. Davis*, 882 F.2d 1134, 1343 (8th Cir. 1989) (same).

Congress has placed a burden on the Government to show the "necessity" of any wiretap application via a full and complete statement as to whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.A. § 2518(3). The burden that this provision imposes on the Government, however, "is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents." *Smith*, 31 F.3d at 1297 (internal quotation marks and citation omitted). Although wiretaps are disfavored tools of law enforcement, the Government "need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence [such that] wiretapping becomes reasonable." *Id.* at 1298 (internal quotation marks, alteration, and citation omitted).

The Government's affidavits in support of the wiretap application span 64 pages in the Joint Appendix. (J.A. at 76-139.) In exhaustive fashion, they set forth the techniques that had been used up to that point. Those techniques included confidential informants, undercover agents, surveillance, trash searches, interviews, search warrants, telephone records, reverse buys, GPS trackers, and financial and public

records. The affiants then explained that despite the information they had been able to gain from these traditional sources, they believed that those sources, standing alone, were insufficient to achieve the goals of the investigation and prove the extent of the conspiracy. For example, they explained that confidential informants were unable to identify the higher-ups of the conspiracy. *See United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1988) (holding that a wiretap may be necessary when an "informant would be unable to provide information regarding the upper levels of the conspiracy"). The traditional sources also failed to uncover the conspiracy's cocaine source and the extent to which the coconspirators distributed it for resale.

This showing was sufficient. We have recognized that at times, wiretaps "are necessary tools of law enforcement, . . . particularly where crimes are committed by large and sophisticated organizations." *Id.* at 221-22. Courts must be careful not to read the statute in "an overly restrictive manner," *id.* at 853, which could result in helping insulate more complex and sophisticated conspiracies. In short, the Government here made a sufficient showing that wiretaps were necessary to reach the ultimate goals of the investigation. They also provided the court with ample information to support that showing. "In these circumstances, we [have] decline[d] to disturb the district court's conclusion that such surveillance was necessary to probe a conspiracy that might otherwise have proved impossible to [thoroughly] penetrate." *Id.* Accordingly, the issuing court did not abuse its discretion in authorizing the wiretaps, and the district court did not err in denying Appellants' motion to suppress.

## VI.

Appellants make two arguments with respect to the sufficiency of the evidence. First, Wilson argues that there was insufficient evidence from which to conclude that he possessed a firearm on September 14, 2002. Second, Appellants (especially Powell) argue that the evidence was insufficient to support the jury's conclusion that they were involved in a conspiracy to distribute cocaine and crack cocaine.

When addressing sufficiency of the evidence challenges, we must affirm the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v.*

*United States*, 315 U.S. 60, 80 (1942). "[S]ubstiantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (1996) (en banc). Thus, "we shall reverse a verdict [only] if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt." *Id.*

A.

Wilson argues that there was insufficient evidence linking him to the firearm found in the master bedroom in the Tamar Drive apartment because the firearm was found in the master bedroom, which he contends belonged to Dieter Munz. Wilson further contends that the firearm could not be connected to him because the apartment was rented in Munz's name. The Government, on the other hand, argues that the master bedroom contained evidence that tended to show that the bedroom was shared by Wilson and Munz.

In the same night stand in which the gun was found, police uncovered a drug tally sheet that they believed belonged to Wilson; the tally sheet had the names of dealers who purchased crack cocaine directly from Wilson. Police also found a traffic violation citation in Wilson's name, as well as a prisoner property inventory report with Wilson's name and picture. There was also an envelope full of photos of Wilson and Powell on vacation. Four days later, Wilson was seen moving furniture out of the apartment. Hicks also testified that Wilson told him that he had moved out of his Howard County apartment because it had been raided by police.

Viewing all this evidence in the light most favorable to the Government, as we must, the jury's verdict was reasonable. The Government only had to prove that Wilson's possession was constructive, meaning that he "exercised, or had the power to exercise, dominion and control over the" firearm. *United States v. Jackson*, 124 F.3d 607, 610 (4th Cir. 1997) (finding the evidence sufficient to convict defendant of constructively possessing a gun that was recovered from his mother's house after a domestic disturbance call). When examining all the evidence connecting Wilson to the master bedroom at the Tamar Road apartment in the light most favorable to the Government, we cannot

say that there was "a lack of evidence from which a jury could find guilt beyond a reasonable doubt." *Burgos*, 94 F.3d at 862.

### B.

Appellants argue that the evidence only showed that Murray, Wilson, and Powell may have dealt drugs as individuals and that the three men knew each other, but did not go so far to show that they conspired together to distribute narcotics. The evidence with respect to Wilson and Murray's connection in the conspiracy was so overwhelming that it merits no further discussion, and in fact, Appellants barely lift a finger in arguing otherwise. Powell, on the other hand, argues more forcefully that the evidence was insufficient to show that he had entered into the criminal conspiracy. Nonetheless, his argument has little merit.

Recorded conversations between Powell and his coconspirators proved beyond a reasonable doubt that Powell was connected to the existing conspiracy. When these conversations are viewed in the light most favorable to the Government, there is no doubt that Powell had entered into an agreement to distribute narcotics. Consider, for example, portions of a conversation between Murray and Powell that occurred on June 6, 2003:

> Powell:   Got to give him some money we about to jump off any way. You know what I am saying, but still we making extra money anyway through Ed, you know what I am saying. *Charging nine hundred for these ounces, we making extra money* you what I am saying.

> Murray:   Yep, that's why I ain't tripping . . . .

> Powell:   We going make, we going make, at least make some of money back . . . .

> Murray:   I know.

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*

> Powell:   I got a like a stack on me.

Murray:   Oh we good.

Powell:   Cause [people] going to be hollering today . . . .

Murray:   Longs make sure, longs we got 7 at the end of the tally we good.

Powell:   What seven, oh, oh you talking about after the show?

Murray:   No I am talking about, I'm talking about our work, our street shit.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(J.A. at 2093-94 (emphasis added).)

Beyond the recorded conversations, there was damning evidence against Powell in the form of testimony from Anderson Hicks. Hicks stated that Powell provided him with drugs after his arrest, and more importantly, that Powell alerted Wilson of the impending police raid that led to Wilson's arrest at the Old Court Road apartment. Powell attempts to mitigate Hicks's testimony by arguing that it, "particularly as it relates to Powell, was not trustworthy." (Appellants' Reply Br. at 8.)

This argument, however, misunderstands this court's role in reviewing the sufficiency of the evidence. "In applying this standard of review, we must remain cognizant of the fact that the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *Burgos*, 94 F.3d at 862 (internal quotation marks and alterations omitted). Thus, "determinations of credibility are within the sole province of the jury and are not susceptible to judicial review." *Id.* at 863 (internal quotation marks omitted); *see United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989) (holding that we are "bound by the credibility choices of the jury" (internal quotation marks omitted)).

"[U]pon establishing the conspiracy, only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction, although this connection also must be proved beyond a reasonable doubt." *Burgos*, 94 F.3d at 862. "[A] defendant need not know all of his coconspirators, comprehend the reach of the conspiracy, participate in all the enterprises of the conspiracy, or have joined the conspiracy from its inception." *Id.* at 861. Hicks's testimony, when combined with the recorded conversations between Powell and his coconspirators, proved beyond a reasonable doubt that Powell was connected to the existing conspiracy. The evidence was therefore sufficient to support Powell's conspiracy conviction.

## VII.

For the foregoing reasons, Appellants' convictions and sentences are affirmed.

*AFFIRMED*