**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4712**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TANYA VALENCIA MACK,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William D. Quarles, Jr., District
Judge.  (1:08-cr-00348-WDQ-2)

Argued:  September 21, 2012          Decided:  October 18, 2012

Before WILKINSON and DAVIS, Circuit Judges, and Max O. COGBURN,
Jr., United States District Judge for the Western District of
North Carolina, sitting by designation.

Affirmed by unpublished opinion.  Judge Wilkinson wrote the
opinion, in which Judge Davis and Judge Cogburn joined.

**ARGUED:** William Lawrence Welch, III, Baltimore, Maryland, for
Appellant.  Christopher John Romano, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Rod J.
Rosenstein, United States Attorney, Baltimore, Maryland, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Tanya Valencia Mack challenges her conviction for conspiring to distribute and to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 on various grounds. In particular, she argues that the district court erred in (1) admitting expert testimony regarding the use of coded language on government wiretaps, (2) allowing a prosecution witness to mention a utility bill for Mack's residence, and (3) refusing to define "reasonable doubt" in its jury instructions. For the reasons that follow, we reject these challenges and affirm Mack's conviction.

I.

A.

In January 2008, the Harford County Narcotics Task Force ("Task Force") began to investigate an alleged conspiracy to distribute cocaine involving Mack, as well as her sister, Candis Unita Mack ("Candis"); her brother, Winston Charles Mack ("Winston"); and her boyfriend, Fernando Alexander Settles ("Settles"). As part of its investigation, the Task Force obtained authorization from the Circuit Court for Harford County, Maryland, to intercept telephone calls placed to and from all the conspirators' mobile telephones, including Mack's. Between January and March 2008, the Task Force intercepted

2

thousands of calls, some of which contained coded references to cocaine and the narcotics trade.

The Task Force also conducted visual surveillance of Mack and her coconspirators. For example, on one occasion, Task Force members observed Mack meeting with one individual, whom the police stopped shortly thereafter, discovering cocaine in his vehicle. Task Force members also observed Mack regularly coming from and going to a particular house in Abingdon, Maryland, which they concluded was Mack's residence. Indeed, after the police discovered 250 grams of cocaine on Settles's person during a traffic stop and arrested him for cocaine possession, the driver of the vehicle in which Settles had been travelling called Mack to say that he and Settles had been on their way to the Abingdon house to see Mack when they were pulled over.

Based on the intercepted calls and the surveillance, the Task Force obtained a warrant to search the Abingdon house. The Task Force executed the warrant on March 5, 2008, recovering the mobile telephone on which Mack had made and received the intercepted calls; a digital scale with cocaine residue; inositol, a cutting agent; and baking soda. Mack was present during the search, and the Task Force arrested her at its conclusion.

A federal grand jury indicted Mack -- along with her sister, brother, boyfriend, and a fourth codefendant -- on one count of conspiring to distribute and to possess with intent to distribute fifty grams or more of cocaine base and 500 grams or more of cocaine powder in violation of 21 U.S.C. §§ 841(a)(1) and 846.

### B.

Mack was tried before a jury in the U.S. District Court for the District of Maryland. At trial, the prosecution called as an expert witness Detective Sean Marston, a member of the Task Force who had participated in the investigation of Mack and her coconspirators. Specifically, the prosecution offered Marston "as an expert witness with regard to the methods and practices of drug traffickers and drug conspiracies, with regard to quantities, packaging, prices, and distribution of controlled substances, as well as the interpretation of coded phone language and conversations that occur over wiretaps." To establish his qualifications as an expert on these topics, Marston testified that he had served as a police officer for more than thirteen years; that he had previously served as a task-force officer assigned to the Drug Enforcement Administration; that he had monitored wiretaps dozens of times, listening to thousands of drug-related conversations in the process; that, as a result of his experience, he was familiar

4

with the code words and phrases used by narcotics dealers and purchasers; that he had served as an affiant on the wiretap applications for the telephones used by Mack and her coconspirators and had listened to thousands of their telephone calls; and that the judge presiding over Mack's trial had previously accepted him as an expert in interpreting coded drug-related conversations in the joint trial of Mack's brother and boyfriend.

Although Mack's trial counsel did not object to Marston's testifying as an expert on the general practices and methods of the drug trade or on the details of the distribution of narcotics, he did object to Marston's testifying as an expert in interpreting coded drug-related conversations. Mack's counsel noted that Marston had taken only "high school English, high school Spanish"; that he was "not a linguist"; and that he was "not a cryptographer or a cryptologist." The district court overruled this objection, deeming Marston adequately qualified as an expert in interpreting coded drug-related conversations based on his extensive experience with the drug trade.

As the prosecution proceeded to play recordings of a number of the intercepted telephone calls for the jury, Marston identified various words and phrases on the recordings as coded references to drugs or the drug trade. For example, after learning that the police had seized one kilogram of cocaine from

Candis during a traffic stop, Mack had called another relative to discuss Candis's arrest, and at one point during the conversation, the phrase "the majority" was used. Marston construed this phrase to mean that Mack had contributed most of the money that had been used to purchase the seized kilogram of cocaine. In another intercepted call, Mack instructed Winston to obtain baking soda and to "cook six plates of food," which Marston interpreted as a reference to six ounces of crack cocaine. The jury also heard conversations between Mack and unidentified callers in which the phrases "both kind" and "playing hard, hard, playing basketball" were used. Marston interpreted the first phrase as a reference to powder and crack cocaine and the second as a reference to 3.5 grams of cocaine.

In cross-examining Marston, Mack's counsel noted that Marston would often interpret a particular word -- say, "food" -- as a coded reference to cocaine in one conversation only to ascribe an ordinary, innocent meaning to the very same word in another conversation. To illustrate these discrepancies, Mack's counsel began to play recordings of conversations that Marston had not identified as containing coded language, prompting the prosecution to challenge their relevance. Besides his initial objection to Marston's qualifications as an expert in interpreting coded drug-related conversations, however, Mack's

6

counsel never objected to any of Marston's specific interpretations.

The prosecution also called Detective Aaron David Penman to testify about the search of the Abingdon house and Mack's arrest there. When asked by Mack's counsel on cross-examination whether he had been able to determine who owned the Abingdon house by, for example, checking Maryland State Department of Assessments and Taxation records, Penman testified that he was sure he had checked the records but that he could not recall the result of that inquiry. On redirect examination, the prosecution asked Penman whether he had performed a "utilities check" on the house before applying for a search warrant, to which Penman responded that he had done so, finding a utility bill for the house that was in Mack's name. Mack's counsel objected that Penman's reference to the utility bill contained inadmissible hearsay, but the district court overruled the objection on the ground that the prosecution was asking Penman merely to "report the result of his investigation and state that."

Before the jury retired to deliberate, Mack's counsel asked the district court to define the term "reasonable doubt" in its jury instructions, but the district court denied the request. Instead, the district court instructed the jury merely that it

7

had to find Mack guilty beyond a reasonable doubt, leaving the term undefined.

The jury convicted Mack on the conspiracy charge, and the district court imposed a sentence of 240 months' imprisonment, ten years of supervised release, and a $100 special assessment. This appeal followed.

II.

Mack first argues that the district court erred in allowing Marston to testify as an expert in interpreting coded drug-related conversations. Federal Rule of Evidence 702, which governs the admissibility of expert-witness testimony, requires that a witness be "qualified as an expert by knowledge, skill, experience, training, or education." If so qualified, the witness

> may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

On appeal, Mack contends that Marston's testimony violated Rule 702 in several ways. First, she claims that "Marston lacked sufficient knowledge, skill, experience, training, or

8

education either to opine that certain apparently ordinary language was coded language or to interpret the unidentified code." Second, she contends that Marston's testimony "was not the product of reliable principles and methods" and that Marston "did not apply the principles and methods reliably to the facts of the case."

We review evidentiary rulings to which a defendant objected at trial simply for abuse of discretion, whereas a defendant challenging an evidentiary ruling for the first time on appeal must also satisfy the additional requirements of the "plain error" standard. United States v. Olano, 507 U.S. 725, 732 (1993).

## A.

Mack's counsel fairly presented to the district court his first objection to Marston's testimony -- namely, that Marston was not sufficiently qualified as an expert in interpreting coded drug-related conversations -- when he noted that Marston had no training as a "linguist" or as a "cryptographer" or "cryptologist." We thus review the district court's ruling on this objection, like any other ruling on a properly preserved objection concerning expert testimony, for abuse of discretion. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) (citing United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006)).

"A court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." Johnson, 617 F.3d at 292 (internal quotation marks omitted) (quoting Brown v. Nucor Corp., 576 F.3d 149, 161 (4th Cir. 2009)).

The district court in no way abused its discretion in holding that Marston was adequately qualified as an expert in interpreting coded drug-related conversations. As the text of Rule 702 itself indicates, a witness can be "qualified as an expert" on a particular topic by virtue of his "experience" as well as more formal "training." In accordance with this principle, this Court has held on multiple occasions that a law-enforcement officer can be qualified as an expert in interpreting coded drug-related conversations simply by virtue of his "extensive experience" with the narcotics trade. Wilson, 484 F.3d at 275; see also Johnson, 617 F.3d at 294; United States v. Baptiste, 596 F.3d 214, 222 n.5 (4th Cir. 2010).

Marston undoubtedly had "extensive experience" with the narcotics trade in general and with interpreting coded drug-related conversations in particular. At the time he testified at Mack's trial, Marston had served with the Harford County Sheriff's Department for thirteen years; been the affiant for four wiretap applications, including the application in Mack's case; purchased drugs as an undercover officer; and monitored

10

"[d]ozens" of wiretaps, listening to "thousands" of intercepted phone calls in the process, including "thousands" of calls intercepted in the Mack investigation. Through all this experience, Marston became familiar with the jargon used by narcotics dealers. A veteran law-enforcement officer with extensive experience in narcotics investigations, Marston was clearly qualified to testify as an expert in interpreting coded drug-related conversations, and the district court did not abuse its discretion in so ruling.

## B.

Mack's next challenge to Marston's testimony concerns not Marston's general qualifications, but how he applied them in interpreting particular words and phrases used in the intercepted conversations. Specifically, Mack argues that, even if Marston was generally qualified as an expert, and even if his testimony was ultimately based on "reliable principles and methods," he "did not reliably apply the principles and methods to the facts of the case" because he did not adequately explain "how [he] determined when apparently ordinary language did and did not require his interpretation" or "how he determined specific meanings from vague language." We reject this argument for the very simple reason that Mack's counsel never presented it to the district court, but rather raises it for the first time on appeal.

11

1.

Although this Court has held that an expert witness must adequately explain why he interprets certain words and phrases in wiretapped conversations as coded references to drugs or the drug trade, see Johnson, 617 F.3d at 294-95; Wilson, 484 F.3d at 276-77, we have also held that a defendant must apprise the district court of any inadequately explained interpretations in order to preserve his objections to them for appeal. As a general matter, to preserve a claim that a district court erred in admitting certain evidence, a party must, "on the record: (A) timely object[] or move[] to strike; and (B) state[] the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a)(1). We have thus held that a defendant forfeits his claim that an expert witness inadequately explained his interpretations of coded drug-related conversations unless he objected at trial to the specific interpretations he contends were unsupported. See Wilson, 484 F.3d at 276, 278 n.4. To require any less notice would be to subvert district courts' "'gatekeeper' role in screening expert testimony," id. at 278 n.4 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997)), and to require appellate judges to function as trial judges, a role for which they are ill-suited. Thus, only where a defendant made "objections . . . which were sufficient to provide the district court with notice of the grounds for the

12

objection" will this Court treat the objections as properly preserved for appeal.  Johnson, 617 F.3d at 292 n.6.

Mack's counsel did not afford the district court adequate "notice of the grounds for the objection" that Mack now presses on appeal.  When the prosecution first called Marston, Mack's counsel objected that Marston had studied only "high school English, high school Spanish," and that he was "not a linguist" or "a cryptographer or a cryptologist."  Given that Marston had yet to interpret a single intercepted conversation for the jury, the district court quite understandably construed this objection to go to Marston's general qualifications as an expert in interpreting coded drug-related conversations rather than to the adequacy of his explanations.  And once the prosecution began to play recordings of a number of the intercepted conversations, Mack's counsel never objected to a single one of Marston's specific interpretations.

To be sure, at one point, Mack's counsel complained that Marston had provided "no explanation" for why he identified some seemingly ordinary words and phrases as coded references to drugs or the drug trade but not others.  But Mack's counsel made this statement while explaining his cross-examination strategy in a sidebar with the district court, after the prosecution had questioned the need to play multiple recordings of intercepted conversations that concededly did not contain coded language.

13

Not once did Mack's counsel object to the district court that Marston had inadequately explained his interpretations. He thus did not properly preserve the claim Mack now presses on appeal -- namely, that Marston "did not reliably apply the principles and methods to the facts of the case."

2.

We thus review Mack's claim under the familiar plain-error standard. Under this standard, a criminal defendant must show that the district court made "[1] an 'error' [2] that is 'plain' and [3] that 'affect[s] substantial rights.'" Olano, 507 U.S. at 732 (last alteration in original). An error "affects substantial rights," in turn, if it was prejudicial -- that is, if it "affected the outcome of the district court proceedings." Id. at 734. A defendant bears the burden of showing that any forfeited error was prejudicial. Id. But even if a defendant discharges this burden, "the decision to correct the forfeited error [remains] within the sound discretion of the court of appeals," discretion the court should not exercise "unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 732 (second alteration in original) (quoting United States v. Young, 470 U.S. 1, 15 (1985)).

Even if the district court erred in admitting some of Marston's interpretations of the intercepted conversations, Mack

14

cannot show that this error affected her "substantial rights." The prosecution introduced ample other incriminating evidence to support her conviction. For one, while Marston admittedly failed to explain some of his interpretations, he adequately explained a number of others, and the jury could have deemed the explained interpretations, when combined with the prosecution's other evidence, sufficient to find Mack guilty on the conspiracy charge beyond a reasonable doubt. See Wilson, 484 F.3d at 277-78 (distinguishing adequately explained and unexplained interpretations for purposes of plain-error review). Moreover, some incriminating conversations required no interpretation at all, as when an individual called Mack to say that he and Settles had been driving to Mack's house in Abingdon when the police pulled them over and arrested Settles for possessing cocaine. Even more significant, the intercepted conversations led the police to search Mack's home, where they found not only the mobile phone on which Mack had made and received many of the intercepted calls, but also a digital scale with cocaine residue; inositol, a cutting agent; and baking soda. Although Mack contests the admissibility of Marston's testimony interpreting the intercepted conversations, she does not deny that these conversations provided the police with the probable cause needed to obtain a search warrant for her home. Finally, a number of other detectives testified about their surveillance

15

of Mack, including one instance where they observed her meeting with an individual who was found shortly thereafter with cocaine in his vehicle. Taken together, all this other evidence supports the jury's decision to convict Mack on the conspiracy charge. Whether or not the district court erred in admitting some of Marston's interpretations of the intercepted conversations, any error did not affect Mack's substantial rights as required under the third prong of <u>Olano</u> and thus does not warrant reversal of her conviction.

III.

Mack's counsel objected at trial, and again argues on appeal, that Detective Penman's reference to the utility bill for the Abingdon house contained inadmissible hearsay and that the district court's failure to exclude the reference warrants reversal of Mack's conviction. For the reasons that follow, we disagree.

Penman's statement that the utility bill was in Mack's name did not in fact contain hearsay.[1] This Court has held that "an out of court statement is not hearsay if it is offered for the

---

[1] The prosecution did not attempt to introduce the utility bill itself pursuant to the business-records exception to the hearsay rule, <u>see</u> Fed. R. Evid. 803(6), and thus may not invoke this exception on appeal.

limited purpose of explaining why a government investigation was undertaken" rather than "to prove the truth of the matter asserted in the statement." United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985); see also United States v. Obi, 239 F.3d 662, 668 (4th Cir. 2001).

In overruling the objection of Mack's counsel, the district court understood the prosecution's purpose in asking Penman about the "utilities check" to be to get him to "report the result of his investigation and state that." The district court concluded that the prosecution was not attempting "to prove the truth of the matter asserted" in the utility bill, and we cannot say that the district court abused its discretion in reaching this conclusion.

Moreover, any error committed by the district court in admitting Penman's reference to the utility bill was harmless because the prosecution introduced ample admissible evidence to link Mack to the Abingdon house. See United States v. Banks, 482 F.3d 733, 741 (4th Cir. 2007). One detective, for instance, testified without objection that Mack (and Settles) lived at the Abingdon house, and multiple detectives testified that they had observed Mack frequently coming from and going to the house while she was under surveillance. Another testified that, when the police searched the Abingdon house, they discovered Mack herself, as well as the mobile phone on which she had made and

17

received the intercepted calls. Finally, after the police stopped a vehicle in which Settles had been riding and arrested him for cocaine possession, the driver called Mack to say that he and Settles had been traveling to the Abingdon house to see her. In short, besides Penman's reference to the utility bill, there was overwhelming evidence that Mack lived at the Abingdon house; Penman's statement was merely cumulative of this other evidence and thus did not sway the jury's decision to convict Mack.

IV.

Finally, at the close of her trial, Mack asked the district court to instruct the jury on the meaning of "reasonable doubt" and objected when the district court denied her request, an objection she renews on appeal. This Court has "repeatedly held that a district court need not, and in fact should not, define the term 'reasonable doubt' even upon request." United States v. Williams, 152 F.3d 294, 298 (4th Cir. 1998).

The district court properly heeded this admonition in denying Mack's request for a reasonable-doubt instruction.[2]

---

[2] Having carefully reviewed the argument made by Mack's appellate counsel pursuant to Anders v. California, 386 U.S. 738 (1967), that the district court lacked jurisdiction over Mack, as well as the arguments made by Mack in her pro se appellate brief, we find them to be meritless.

18

V.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED