# FOR PUBLICATION

ATTORNEY FOR APPELLANT
KENYATTA ERKINS:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEY FOR APPELLANT
UGBE OJILE:

**JEFFREY E. STRATMAN**
Aurora, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

FILED

Apr 23 2013, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KENYATTA ERKINS and UGBE OJILE, | ) | |
| | ) | |
| Appellants-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 58A01-1205-CR-215 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE OHIO CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause Nos. 58C01-1103-FA-2 and 58C01-1103-FA-3

**April 23, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

Kenyatta Erkins and Ugbe Ojile (collectively referred to as "Appellants") spent an evening at a casino during which they were monitored by police. Ojile spent most of the night watching S.M. gamble and saw that he had about $20,000. Erkins waited outside in Ojile's girlfriend's car. Erkins and Ojile had several cell phone conversations about robbing S.M. that were recorded by the police. Eventually, S.M. reserved a room at the casino. Ojile left the casino and dropped Erkins off at his residence. On his way home, Ojile had another phone conversation with Erkins about robbing S.M. The following day, Ohio police stopped and searched Erkins's car and found dark clothing, camouflage gloves, duct tape, and a backpack containing a handgun and a bullet. Ohio police also searched Ojile's apartment and found more ammunition for the handgun found in the backpack. Ojile and Erkins were charged with and convicted of class A felony conspiracy to commit robbery resulting in serious bodily injury.

Appellants appeal their convictions arguing that (1) the trial court erred in permitting the State to amend the charging information on the second day of trial; (2) the evidence was insufficient to support their convictions for class A felony conspiracy because no actual injury to S.M. occurred, and even if actual injury is not required to sustain their convictions, there was insufficient evidence that they intended and agreed to cause S.M. serious bodily injury; (3) the trial court abused its discretion in admitting the evidence gathered after they left the casino; (4) the trial court abused its discretion in admitting testimony that interpreted the slang used in their phone conversations; and (5) the prosecutor committed misconduct

2

resulting in fundamental error during closing argument by referring to the possible murder of S.M. because it was unsupported by the evidence. Ojile also argues that his counsel provided ineffective assistance by failing to argue the defense of abandonment.

We conclude that (1) the amendment to the charging information was one of form, not substance, and therefore the trial court did not err in permitting the amendment; (2) the evidence was sufficient to show that Appellants intended and agreed to commit a robbery of S.M. that would result in serious bodily injury, which is all that is required to obtain a conviction for class A felony conspiracy to commit robbery resulting in serious bodily injury; (3) the trial court did not abuse its discretion in admitting evidence gathered after Appellants left the casino; (4) most of the testimony interpreting Appellants' conversation was helpful to the jury and therefore admissible, and any error in admitting inadmissible interpretations was harmless; and (5) the prosecutor did not present argument that was unsupported by the evidence and therefore did not commit misconduct let alone cause fundamental error. We also conclude that Ojile's trial counsel did not render ineffective assistance. Accordingly, we affirm Appellants' convictions.

**Facts and Procedural History**

The evidence most favorable to the convictions follows. On the evening of October 5, 2010, Ojile and Erkins were being monitored by police as they drove to and from various casinos. The police had obtained a wiretap warrant for Erkins's cell phone and a warrant to attach GPS monitors to Erkins's vehicle and Ojile's girlfriend's vehicle. That night, Ojile drove his girlfriend's Volkswagen Jetta from Erkins's residence to the Hollywood Casino in

3

Lawrenceburg, to the Grand Victoria Casino (now Rising Sun), and then to Belterra Casino in Florence. Finally, they drove back to the Grand Victoria Casino, arriving at 12:50 a.m. Ojile went inside the casino, and Erkins stayed in the car. Ojile remained in the casino for about two and a half hours. Ojile's actions in the casino were recorded by the casino's surveillance cameras. Except for the times Ojile stepped away to make a phone call, he stood near a card table watching S.M. play cards.

During the early morning hours of October 6, 2010, Ojile and Erkins spoke on their cell phones multiple times. Around 1:00 a.m., Ojile called Erkins and told him that S.M. was playing cards and had about $600 in front of him on the table, but Ojile was going to leave. Ten minutes later, Ojile called Erkins and told him that as he was about to leave, he saw S.M. take what appeared to be at least $20,000 out of his pocket to purchase more chips. Ojile told Erkins that he did not want to waste an entire evening, but that it would be worth it to wait and see if S.M. was going to leave soon. He asked Erkins for his opinion. Erkins replied that he was in the car and would do whatever Ojile wanted. Ojile asked Erkins if he wanted to wait fifteen or twenty minutes. Erkins said that they could wait another hour.

At 2:48 a.m., Erkins called Ojile to ask what was going on. Ojile told him that he had heard S.M. turn down an offer from the casino for a room, so he knew that S.M. was not going to spend the night at the casino. Ojile told Erkins that "we should go lay on him" because S.M. just won $28,000 on the roulette machine. Tr. at 321; State's Ex. 3, 7. Ojile said, "I willing like, go all the way with this mother f***er." … I don't think we are going to see any like this like anytime soon." *Id.*; State's Ex. 3, 7. Ojile told Erkins that S.M. was

4

drunk. Ojile said that he was going to get some chips and something to eat, and Erkins said that was all right.

At 3:37 a.m., Ojile walked out of the casino. At 3:41 a.m., S.M. reserved a hotel room at the casino. At 3:49 a.m., Ojile and Erkins left Grand Victoria Casino and drove to the Hollywood Casino. They stayed there thirty minutes and then drove to Erkins's residence. Ojile dropped Erkins off and drove home. While Ojile was driving home, they had another cell phone conversation (the "Last Conversation"), in which they discussed robbing S.M. the following day and agreed that S.M. would not easily surrender his money:

> Ojile: Yeah, so I take it's a wrap like that's a hot area right?
>
> Erkins: I mean, it might not be a wrap but I'm just saying though like, like just being around there in the day time and s**t like that going off knowing that that's a working neighborhood.
>
> Ojile: Right.
>
> Erkins: You know what I'm saying? Like it probably still can work [robbing S.M.] but, I just think he gonna be a problem.
>
> Ojile: Yeah, he ain't gonna just be no smooth.
>
> Erkins: Yeah I don't think he a be smooth.
>
> Ojile: Especially cuz it's day, he might just …
>
> Erkins: Yeah that's what I'm saying like, being day time and you know whatever, whatever, you know really ain't got nobody to help, if we kind of like roughed him up and s**t like that like. I don't know, like I said man, them mother f***ing arabs, be thinking like they like they, they be thinking they niggas and s**t.
>
> Ojile: Right.

Erkins:     They not niggas, cause even a nigga could try to do mother f***ers be on some bulls**t.  Smack them around a little bit.

Ojile:     F**k.

Erkins:     I told you man, seems like everything I told you, like when you see something, told you, mother f***ers be staying (laughing).

Ojile:     Right.

Erkins:     That's exactly what be happening, mother f***ers be stayin, you like all hell no.  Yep, you can't put to much energy in this s**t.

….

Ojile:     Try again tomorrow or something with this s**t.

Erkins:     That's it.  Yeah, but you know.  Like I said, you can't be putting too much into it, you know these week, these weekdays, you know what I mean?  Either, either it is or it ain't.  You know what I mean.  It's like s**t, if it ain't like just keep it moving, you know cuz I mean like you know s**t mother f***ers, think mother f***ers should put their overtime in on a mother f**ing weekends man.  Them weekdays, man, them days should kind of end earlier, like if you don't see, if you don't see nothing early it's probably just time to just keep it moving.

….

Ojile:     But today was kind of true to the situation man, because like dude that got a lot of s**t man, its pocket gonna look fat, and today was just a test[a]ment to it, you know, it ain't like, I seen it fat, I was like man that ain't no napkin, you know (laughing).

Erkins:     Right, it wanted no (inaudible) sheet.

Ojile:     Right, so dude had to go hard when nigga had that bulge, you know what it is (laugh).

….

Erkins:     So, you at, you at the crib?

Ojile:          No, I'm not.  I'm a still on Colerain trying to get to 74, but I'm straight man, so yeah, you wanna stay at home with that nigga, and then uh, we will try tomorrow.

Erkins:         Alright.

State's Ex. 2, 7.

In the early morning hours of October 7, 2010, Erkins and Ojile drove away from the Hollywood Casino in Erkins's Dodge Magnum.  At approximately 2:30 a.m., Ohio police stopped and searched Erkins's Dodge.  Police seized a backpack from the floor in front of the passenger seat in which Ojile had been sitting.  The backpack contained several documents with Ojile's name on them, a .40 caliber Glock handgun, a BB gun that looked like a handgun, and a .40 caliber cartridge.  Police also found dark clothing, camouflage gloves, and a roll of duct tape.  Ojile was still wearing the same clothes he had on the night before.  Police also searched Ojile's apartment and discovered a loaded magazine for the Glock.

On March 10, 2011, Appellants were each charged with one count of class A felony conspiracy to commit robbery resulting in serious bodily injury and one count of class A felony attempt to commit robbery resulting in serious bodily injury.  On March 12, 2012, a joint jury trial commenced with the selection of jurors.  On the second day of trial, after the jury was sworn but before opening arguments, the State moved to dismiss the attempt charges and to amend the conspiracy charges by substituting Ojile's name for Erkins's as the person who committed the overt act of surveilling the victim.  The motion was granted over Appellants' objections.  The jury found Appellants guilty as charged.  They appeal.

7

## Discussion and Decision

### I. Amendment to Charging Information

Appellants argue that the trial court erred in permitting the State to amend the charging information on the second day of trial. Appellants were charged with and convicted of conspiracy, which is defined in Indiana Code Section 35-41-5-2:

> (a) A person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same class as the underlying felony. However, a conspiracy to commit murder is a Class A felony.
>
> (b) The state must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement.

The State's charging information originally read:

> On or about October 6, 2010, in Ohio County, State of Indiana, Ugbe Ojile and Kennyatta [sic] Erkins, with intent to commit the felony of Robbery Causing Serious Bodily Injury, did agree with one another to commit the felony of Robbery Causing Serious Bodily Injury and Kennyatta [sic] Erkins did perform an overt act in furtherance of said agreement, to-wit: conducted surveillance on [S.M.] at the Grand Victoria Casino.

Ojile's App. at 51. The trial court permitted the State to amend the information by changing the identity of the coconspirator who conducted the surveillance from Erkins to Ojile.

Whether an indictment or information may be amended after the commencement of trial depends upon whether the amendment is one of form or substance. An amendment of substance is not permissible after trial has commenced. Ind. Code § 35-34-1-5(b). After the commencement of trial, the court may "permit an amendment to the indictment or information in respect to any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant." Ind. Code § 35-34-1-5(c). Accordingly,

8

the first step in evaluating the permissibility of amending an indictment or information is to determine whether the amendment is addressed to a matter of substance or one of form or immaterial defect. … [A]n amendment is one of form, not substance, if both (a) a defense under the original information would be equally available after the amendment, and (b) the accused's evidence would apply equally to the information in either form. And an amendment is one of substance only if it is essential to making a valid charge of the crime.

*Fajardo v. State*, 859 N.E.2d 1201, 1207 (Ind. 2007).

"Whether an amendment is a matter of substance or form is a question of law, which we review *de novo*." *Gibbs v. State*, 952 N.E.2d 214, 221 (Ind. Ct. App. 2011) (citing *Fields v. State*, 888 N.E.2d 304, 310 (Ind. Ct. App. 2008)), *trans. denied* (2012). "A defendant's substantial rights include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights." *Gomez v. State*, 907 N.E.2d 607, 611 (Ind. Ct. App. 2009), *trans. denied* (citation and quotation marks omitted). "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." *Hurst v. State*, 890 N.E.2d 88, 95 (Ind. Ct. App. 2008), *trans. denied* (citation and quotation marks omitted).

Appellants contend that by changing the identity of the person performing the act of surveillance, the State changed the nature of their defense, and therefore the amendment was one of substance. Specifically, they assert that they were unable to present a defense that Erkins had not engaged in surveillance of S.M. and therefore no overt act in furtherance of an agreement to commit robbery resulting in serious bodily injury had been committed.

9

In support of their argument that the amendment was one of substance, Appellants cite *Gibbs*, 952 N.E.2d 214. Gibbs lived by himself in an apartment within a multi-family residence containing three different apartments. After he set his apartment on fire, the State charged him with three counts of class B felony arson.[1] Count I alleged that he knowingly damaged, by fire, the residence of Mary Tallie at 32 North Rural Street, under circumstances that endangered human life. Count II was the same except that it alleged that the damaged property was the residence of Angela Anthony at 32 North Rural Street. After trial commenced, the trial court permitted the State to amend the information to omit Tallie's and Anthony's names, such that the damaged property was identified only by the 32 North Rural Street address.

On appeal, Gibbs argued that the amendments were impermissible substantive amendments. The *Gibbs* court agreed, explaining as follows:

> As Gibbs contended in his objection to the State's amendment, he had planned to argue at trial that he was not guilty of the charges as they were originally stated because he did not actually cause damage to Tallie['s] and Anthony's apartments. Instead, the fires only damaged Gibbs'[s] apartment. When the State amended the Information to omit Tallie['s] and Anthony's names from the charges, he was no longer able to make the same defense. Accordingly, the amendment was substantive because his defense was not equally available after the amendment and his evidence did not apply equally to the Information in either form.

*Id*. at 221 (citation and quotation marks omitted).

---

[1] Indiana Code Section 35-43-1-1(a) provides in relevant part that a person who, by means of fire, knowingly or intentionally damages property of any person under circumstances that endanger human life commits arson, a class B felony.

*Gibbs* is not dispositive. There, to sustain a conviction for class B felony arson, the State was required to prove that Gibbs damaged a person's property. Ind. Code § 35-43-1-1(a). The State alleged that Gibbs damaged Tallie's and Anthony's residences. Gibbs was prepared to argue and present evidence that neither residence had been damaged, which would have negated an element of the charged crime.

In this case, the State was required to prove all the elements of conspiracy. The relevant element in issue is the commission of an overt act. The conspiracy statute provides that the "state must allege and prove that *either the person or the person with whom he agreed* performed an overt act in furtherance of the agreement." Ind. Code § 35-41-5-2(b) (emphasis added). According to the statute, the identity of the coconspirator who performed the overt act is not essential to the charge. *See Parahams v. State*, 908 N.E.2d 689, 691 (Ind. Ct. App. 2009) ("'[F]acts which may be omitted from an information without affecting the sufficiency of the charge against the defendant are mere surplusage and do not need to be proved.'") (quoting *Bonner v. State*, 789 N.E.2d 491, 493 (Ind. Ct. App. 2003)). Thus, the State was required to prove that one of the coconspirators, here either Ojile or Erkins, committed an overt act in furtherance of their agreement. Appellants could not have successfully argued that an overt act had not been performed simply by arguing that Erkins had not performed the overt act where, as discussed in greater detail in the next section, all the evidence showed that his coconspirator Ojile had performed it.

In addition, the amendment did not prejudice Appellants' substantial rights. The probable cause affidavit and all the video surveillance indicated that Ojile was the person in

the casino preforming the surveillance, and Appellants knew it. *See* Tr. at 190 (Erkins's counsel stating that the probable cause affidavit and the video surveillance showed that Ojile was the person in the casino); *id*. at 192 (Ojile's counsel agreeing). We conclude that the amendment was one of form that did not prejudice Appellants' substantial rights. *Cf. Martin v. State*, 537 N.E.2d 491, 494 (Ind. 1989) (concluding that amendment to information to change name of person to whom defendant delivered drugs to conform to evidence did not prejudice defendant's substantial rights). Therefore the trial court did not err in granting the State's motion to amend the charging information.

## *II. Sufficiency of Evidence*

Appellants next contend that the evidence is insufficient to support their convictions for class A felony conspiracy to commit robbery resulting in serious bodily injury. Our standard of review is well settled:

> In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment, and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Wieland v. State*, 736 N.E.2d 1198, 1201 (Ind. 2000).

A person commits the crime of conspiracy when: (1) with intent to commit a felony; (2) the person agrees with another person to commit the felony; and (3) an overt act is performed by the defendant or the person with whom the defendant made the agreement in furtherance of that agreement. Ind. Code § 35-41-5-2. "In proving the agreement element,

12

the State is not required to show an express formal agreement, and proof of the conspiracy may rest entirely on circumstantial evidence." *Wieland*, 736 N.E.2d at 1203.

Robbery is defined in Indiana Code Section 35-42-5-1, which provides,

> A person who knowingly or intentionally takes property from another person or from the presence of another person:
>
> (1) by using or threatening the use of force on any person; or
>
> (2) by putting any person in fear;
>
> commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and *a Class A felony if it results in serious bodily injury to any person other than a defendant*.

(Emphasis added.)

> "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes:
>
> (1) serious permanent disfigurement;
> (2) unconsciousness;
> (3) extreme pain;
> (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or
> (5) loss of a fetus.

Ind. Code § 35-31.5-2-292.

Appellants first contend that the robbery statute requires the actual existence of serious bodily injury because the robbery statute uses "results" and S.M. did not suffer any injury whatsoever. This is an issue of first impression.[2]

Indiana Code Section 35-42-5-1 makes the crime of robbery more serious when it is committed in such a way that serious bodily injury to a person other than the defendant is a result of the crime. To sustain a conviction for class A felony robbery, "[t]he state does not have to prove that the defendant knowingly or intentionally caused such injury. If serious bodily injury occurred as a consequence of the conduct of the accused, the offense is a class A felony." *Phares v. State*, 506 N.E.2d 65, 69 (Ind. Ct. App. 1987).

Here, however, Appellants did not actually commit robbery and were not charged with robbery. Appellants were charged with and convicted of *conspiracy*. By its very nature, conspiracy is a crime of intent and agreement. To sustain a conviction for conspiracy, the State is not required to prove that the crime intended and agreed upon was actually committed or even attempted. *Coleman v. State*, 952 N.E.2d 377, 382 (Ind. Ct. App. 2011). Appellants' argument that the robbery statute requires actual injury ignores the fact that

---

[2] Appellants cite no caselaw supporting their argument that coconspirators must actually cause serious bodily injury in order for a defendant to be convicted of a conspiracy enhanced by the coconspirators' intent to inflict serious bodily injury. Our own research of Indiana and our sister states has not revealed any cases that have addressed this issue. Two Indiana cases are somewhat related to the issue before us. In *Phares v. State*, 506 N.E.2d 65 (Ind. Ct. App. 1987), the court held that proof of an agreement to inflict serious bodily injury is not required to sustain a conviction for conspiracy enhanced to a class A felony for serious bodily injury when the overt act committed in furtherance of the conspiracy actually resulted in serious bodily injury. *Id*. at 69. In *Fields v. State*, 825 N.E.2d 841 (Ind. Ct. App. 2005), *trans. denied*, the court held that a conviction for class A felony conspiracy to commit burglary causing bodily injury or serious bodily injury could not be sustained where there was no proof that the coconspirators intended to cause bodily injury or serious bodily injury and the overt act in furtherance of the conspiracy did not result in injury to the victims even though the victims were injured during the burglary that was committed three days after the overt act was committed. *Id*. at 848-49.

14

Appellants' were charged with conspiracy to commit robbery resulting in serious bodily injury.[3] Conspiracy is a felony of the same class as the underlying felony. Ind. Code § 35-41-5-2. Their argument implies that two people could never conspire to achieve a specific result.[4] We are unpersuaded. Accordingly, we conclude that the evidence is sufficient to support a conviction for class A felony conspiracy to commit robbery where the State establishes beyond a reasonable doubt that the coconspirators intended and agreed to cause serious bodily injury to the victim in perpetrating the robbery.

Appellants also assert that even if the mere intent to inflict serious bodily injury while committing a robbery supports a conviction for class A conspiracy, there was insufficient evidence that they intended to inflict serious bodily injury on S.M. We disagree. The evidence shows that in the middle of the night Ojile surveilled S.M. for two and a half hours. Meanwhile, Erkins waited in Ojile's girlfriend's car. During the surveillance, Ojile told Erkins that they "should lay on [S.M.]" and that he was willing to "go all the way." State's Ex. 3, 7. Erkins did not disagree with these comments. Rather, Erkins agreed that it would be all right to continue to wait to see if S.M. was going to leave. After it became clear that S.M. was going to spend the night at the casino, Appellants went home. However, that was

---

[3] Appellants' citations to caselaw addressing the distinction between bodily injury and serious bodily injury are inapposite.

[4] Appellants argue that conspiracy crimes cannot include result oriented or strict liability crimes. Citing a criminal law treatise, Appellants correctly observe that conspiracy cannot include strict liability crimes such as felony murder. 2 Wayne R. LaFave, *Substantive Criminal Law*, Section 12.2(c) at 278 (2d. ed. 2003). However, Appellants' attempts to place the serious bodily injury enhancement in the same category as felony murder is misplaced. In Section 12.2(c), Professor LaFave explains that because a conspiracy is premeditated, a conspiracy to commit murder must necessarily be of the same felony class as first degree murder. Professor LaFave does not discuss the issue before us, and his reasoning with regard to felony murder does not exclude a conspiracy to achieve a specific result.

not the end of their plans to rob S.M. They had another conversation in which they talked about S.M. at length. Ojile and Erkins each stated that S.M. would not be a "smooth." State's Ex. 2, 7. Erkins stated that no one would be around in the daytime to help S.M. if "we kind of like roughed him up and s\*\*t like that." *Id*. When Appellants were picked up the following day by Ohio police, they had dark clothing, camouflage gloves, duct tape, and a backpack containing a .40 caliber Glock handgun and a .40 cartridge. Based on the evidence favorable to the convictions and the reasonable inferences arising therefrom, we conclude that a reasonable factfinder could find beyond a reasonable doubt that Appellants intended and agreed to inflict serious bodily injury on S.M. when they robbed him.[5] Appellants' argument is merely an invitation to reweigh the evidence, which we may not do.

### III. Admissibility of Evidence Obtained After Appellants Left Grand Victoria Casino

Appellants contend that the recording of their Last Conversation and the items police seized from Erkins's car and Ojile's apartment were extrinsic to the alleged crime, and therefore were improperly admitted into evidence. "The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion." *Bradford v. State*, 960 N.E.2d 871, 873 (Ind. Ct. App. 2012). "An abuse of discretion occurs 'where the decision is clearly against the logic and effect of the facts and circumstances.'" *Id*. (quoting *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001)).

---

[5] Erkins's argument that his intent cannot be inferred from Ojile's statements and possession of a gun ignores the fact that he and Ojile were coconspirators and that he independently expressed his willingness to use violence against S.M.

16

## A. *Recording of Appellants' Last Conversation*

Although a significant portion of the Last Conversation is set forth above, we review it here and add some additional content. In the Last Conversation, Appellants discussed robbing S.M. the following day and the necessity of using violence against S.M. to succeed in the robbery because he was not going to be a "smooth." State's Exhibit 2, 7. Erkins said that no one would be around to help S.M. "if we kind of like roughed him up and s**t like that like." *Id*. Erkins also said, "Smack them around a little bit." *Id*. They agreed to try again the next day. Then Erkins stated that they had stayed out late that night and that on weekdays they should not stay out so late. Ojile expressed his excitement about the large amount of money in S.M.'s pocket, apparently to explain why he had wanted to stay so long. Appellants agreed that on weekdays the cutoff time should be seven to eleven and on weekends eleven to four. Erkins said, "You know what I'm saying, cause you know mother f***ers … are prone to leaving late on the weekends and then the weekdays. The weekdays mother f***ers are prone to leave early." *Id*. Ojile said, "[W]e will try again tomorrow," and Erkins said, "Alright." *Id*.

Appellants argue that the Last Conversation was inadmissible based on Indiana Rules of Evidence 404(b) and 403. In making both arguments, Appellants focus solely on the portion of the Last Conversation in which they discussed the best hours to go out. Appellants attempt to characterize that evidence as evidence of other crimes, wrongs or acts and argue that the Last Conversation was inadmissible because it did not fall within the intent

17

exception of Rule 404(b).[6] Their argument is based on the assumption that the content of the Last Conversation is extrinsic to the alleged crime. That assumption is unfounded. Appellants ignore the considerable content of the Last Conversation that was relevant to the crime charged. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401.

Here, the crime charged was conspiracy to rob S.M. resulting in serious bodily injury. The State had to prove that Appellants intended to rob S.M. resulting in serious bodily injury, had an agreement to rob S.M. resulting in serious bodily injury, and had performed an overt act in furtherance of their agreement. The overwhelming bulk of the Last Conversation was directly related to S.M. The Last Conversation contained evidence that was clearly relevant in establishing that Appellants intended and agreed to rob S.M., that they had spent most of that evening monitoring S.M. (the overt act) and waiting for him to leave because he had an impressive amount of money, that they had not given up on their plan to rob S.M. but were planning to rob him the following day, and that they intended to use violence to rob S.M. To the extent that Appellants discussed hours to go out, that discussion arose because they had

_____

[6] Indiana Evidence Rule 404(b) provides,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

stayed out so late that night surveilling S.M., which they concluded was not efficacious. Accordingly, we are unpersuaded by Appellants' argument that the Last Conversation was extrinsic to the crimes charged. As their assumption underlying their Evidence Rule 404(b) argument is invalid, we need not address that argument further.

Appellants also contend that the Last Conversation was inadmissible based on Indiana Evidence Rule 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Appellants assert that they were discussing "potential future uncharged criminal behavior" that "implied that the men are career criminals and thus are capable of committing the crime alleged because they are the type of people who talk about committing crimes." Erkins's Br. at 27; Ojile's Br. at 24-25. Appellants overstate the scope of their discussion. They simply discussed what hours were best to go out. To the extent it can be said that the hours discussion constitutes discussion about future uncharged crimes, any unfair prejudice is clearly outweighed by the clear relevance of the evidence to the crimes charged. Accordingly, we cannot say that the trial court abused its discretion in admitting the Last Conversation.

### B. Items Seized From Erkins's Car and Ojile's Residence

Appellants assert that the items police recovered from the search of Erkins's car and Ojile's residence were inadmissible because they "had no connection to the October 6th alleged crime." Erkins's Br. at 28; Ojile's Br. at 26. These items include a .40 caliber Glock

19

handgun, a BB gun that looked like a handgun, a .40 caliber cartridge, dark clothing, camouflage gloves, and a roll of duct tape. In addition, a loaded magazine for the Glock was recovered from Ojile's apartment. Appellants argue that the items were unconnected to the alleged offense because they were found in a different car and in a different state, and there was no evidence that they had the backpack on October 6, 2010.

Appellants' arguments disregard the ongoing nature of their conspiracy. We agree with the State that "[b]ecause the conspiracy was active, the contents of Ojile's backpack were relevant and probative, particularly because there was evidence that [Appellants] intended to inflict injury on [S.M.] in the course of the robbery." Appellee's Br. at 22. Appellants' argument goes to the weight of the evidence rather than its admissibility. *See Taylor v. State*, 587 N.E.2d 1293, 1300 (Ind. 1992) ("We have held that any evidence which connects the defendant with the crime is admissible. We also have held that if evidence only inconclusively connects the defendant with the crime, this goes to the weight, not to the admissibility, of the evidence.") (citation omitted). As for the loaded magazine found in Ojile's apartment, that was relevant and probative to establish ownership of the handgun found in the backpack in Erkins's car.

Appellants' rely on *Brown v. State*, 747 N.E.2d 66 (Ind. Ct. App. 2001), to support their argument that the dark clothing, handgun, duct tape, and ammunition were irrelevant to the charged offenses. Brown was charged with possession of an unlicensed handgun. The *Brown* court concluded that a shotgun, duct tape, and ski masks were irrelevant to the charged offense and were therefore inadmissible. Appellants contend that the items in *Brown*

20

are almost exactly like the items found in this case. Appellants ignore that the defendant in *Brown* was charged with a different crime. Appellants were charged with conspiracy to commit robbery resulting in serious bodily injury, and therefore, the gun, ammunition, mask, dark clothing, and other items were relevant. In fact, the *Brown* court noted, "There could be instances where such evidence would have been relevant, a burglary or robbery charge for instance." *Id*. at 68. We cannot say that the trial court abused its discretion in admitting the items seized from Erkins's car and Ojile's apartment.

### IV. Admissibility of Lay Witness Testimony

The State offered the testimony of Detective Tina Ziegler to provide the jury with an understanding of Appellants' use of street jargon in their phone conversations. Her testimony follows:

Q. He used the language on the phone call at 1:10 on 10/6/2010 – Mr. Ojile said, "cause I don't want to waste all night here, but damn, if the nigga leaving, it's way worth it man." What is your interpretation of that?

A. It's worth going after him to rob him, because he has so much money.

….

Q. And then he states: "even if this mother f***er leaves for real, I think we should go lay on him, man." In your training and experience, what does "go lay on him" mean?

A. Lay on him would be to go out and lay in wait to rob him.

Q. And when he says, "go all the way with this mother f***er, man" what does he mean by that?

A. Go all the way would mean to do whatever it takes, use whatever act of violence, to rob him.

21

Q.	And, uh, that was Ugbe Ojile that said "we should go lay on him, and go all the way with this mother f***er, man?"

A.	That's correct.

….

Q.	And when he states – Ugbe Ojile states, "I think he's going to leave, man, and even if he don't, even to be honest with you, I'm going to go try see if I can find a sitter for D.J., man" and he says, "I'm just going to go post up at the crib, man, because I already know where he's staying." What does he mean by, "I'm going to go post up at the crib, man, because I already know where he staying?"

A.	That means he already knows the location of where this target lives and he's going to go and wait for him, so that he can rob him.

Q.	And in the subsequent phone call, in the last phone call taken –- or recorded at 4:57 a.m., when Ugbe Ojile says, "I take it it's a rap, like that's a hot area, right?" and Kennyatta [sic] Erkins says, "I mean, it might not be a rap, but I'm just saying, like, just being around there in the daytime and s**t like that going off, knowing that that's a working neighborhood" – what do they mean by that?

A.	That means that if they wait until it's daylight hours to rob this target, then there's too many people around and too many witnesses and it would not be a good idea, so they will not follow through.

….

Q.	Um, in your interpretation, in your training and experience, when he says – training and experience as being Cincinnati police officer for eighteen years and dealing with individuals involved in the criminal enterprise and using their lingo, when Kennyatta [sic] Erkins says, "them mother f***in' Arabs be thinkin' like they – like they, they be thinkin' they like niggas and s**t" – what is Kennyatta [sic] Erkins referring to?

A.	That they may put up a fight and get robbed.

Q.  And when Ugbe Ojile says, "yeah, he ain't gonna be just no – just be no smoothe [sic]," what does that mean in your training and experience as a law enforcement officer?

A.  That means he's not going to submit; if he's robbed, he is going to fight back.

Q.  As stated earlier, they're prepared to go all the way with it, correct?

A.  Correct.

Tr. at 321-24.

Appellants assert that the trial court abused its discretion in admitting Detective Ziegler's testimony because it violated Indiana Evidence Rules 701 and 704. As stated previously, "we review the admission of evidence only for abuse of discretion." *Bradford*, 960 N.E.2d at 873.

Appellants contend that Detective Ziegler's testimony was not helpful to the jury because the various meanings of their conversations were already clear, and therefore her testimony was inadmissible pursuant to Indiana Evidence Rule 701, which provides,

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

23

In support of their argument, Appellants cite *United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007).[7] There, a detective for the prosecution interpreted the phrase "he take too long, I'm going to go see my other man, yo" to mean that if he "keeps on taking forever to supply him, that he's going to go to another supplier." *Id.* at 276 (citation and quotation marks omitted). The *Wilson* court concluded that the testimony was unhelpful to the jury, stating that the detective "was not so much interpreting the meaning of [the] quoted language as he was adding language to it," and the "actual language used … needed no translation." *Id.* at 277. However, the *Wilson* court concluded that

> although the district court erred in failing to exclude [the detective's] testimony when that testimony either interpreted language that needed no interpretation, or when [he] did not adequately explain his methodology in reaching a questionable interpretation, the net effect was harmless because the overwhelming majority of [his] expert testimony was properly admitted, that properly admitted testimony was alone sufficient to show Appellants' guilt with respect to the conspiracy charges, and any prejudice that flowed from the limited amount of improper testimony was outweighed by [the detective's] properly admitted expert testimony and the corroborative testimony of coconspirators.

*Id.* at 278 (footnote omitted).

Although not every phrase of Appellants' phone conversations needed interpretation, the meanings of the majority of the phrases were not clear to persons who have no knowledge of street slang, and we think that Detective Ziegler's interpretation was helpful to the jury. The meanings of phrases such as "go lay on him," "post up at the crib," "it's a rap,

---

[7] "We have observed that federal courts' interpretation of the Federal Rules of Evidence may be of some utility because of the similarity between the Indiana Rules of Evidence and the Federal Rules of Evidence." *Palacios v. State*, 926 N.E.2d 1026, 1032 n.3 (Ind. Ct. App. 2010).

like that's a hot area," "he ain't gonna just be no smooth," "they be thinkin' they like niggas" are not obvious to people who are unfamiliar with street slang. Tr. at 321-22, 324. However, not all of Appellants' language needed to be interpreted. The phrase "cause I don't want to waste all night here but damn, if the nigga leaving, it's way worth it, man," does not contain any special street slang. *Id*. at 321. Nevertheless, "[a]n error in the admission of evidence does not justify setting aside a conviction unless the erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties." *Udarbe v. State*, 749 N.E.2d 562, 567 (Ind. Ct. App. 2001); Ind. Trial Rule 61. The erroneous admission of evidence is harmless when there is substantial independent evidence of guilt such that it is unlikely that the erroneously admitted evidence played a role in the conviction. *Greenboam v. State*, 766 N.E.2d 1247, 1256 (Ind. Ct. App. 2002), *trans. denied*.

Here, the independent evidence of Appellants' guilt, including their recorded phone conversations, the surveillance video, and the items recovered from the searches of Erkins's vehicle and Ojile's apartment, was substantial. In addition, the questionable aspect of Detective Ziegler's testimony was minimal, and therefore we conclude that it is highly unlikely that any erroneously admitted evidence played a role in the convictions. As such, any error in admitting testimony that violated Evidence Rule 701 was harmless.

Appellants also assert that Detective Ziegler's testimony violated Indiana Evidence Rule 704, which provides,

> (a) Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

25

(b) Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions.

Appellants argue that Detective Ziegler's testimony "goes beyond analyzing the language used and puts her own opinion on what the men intended to do" and that "her opinions go to the legal conclusion the jury must determine – whether the men conspired to rob S.M." Erkins's Br. at 39; Ojile's Br. at 35. Appellants mistakenly contend that "[w]itnesses may not give an opinion regarding the ultimate issue to be determined by the jury." Erkins's Br. at 39; Ojile's Br. at 35. Appellants' claim is contrary to Evidence Rule 704(a), which specifically states that opinion testimony may embrace an ultimate issue to be decided by the trier of fact. Further, the cases cited by Appellants are inapposite because they involved testimony that directly commented on a person's guilt or innocence in violation of Rule 704(b). *See Smith v. State*, 721 N.E.2d 213, 217 (Ind. 1999) (detective's statement to defendant during police interview that "I thought it was you" was inadmissible); *Ashworth v. State*, 901 N.E.2d 567, 571 n.3 (Ind. Ct. App. 2009) (detective's opinion that two other suspects "had absolutely nothing to do with this crime" was straightforward violation of rule prohibiting opinion testimony regarding an individual's guilt or innocence) (citing Ind. Evid. Rule 704(b)), *trans. denied*; *Myers v. State*, 887 N.E.2d 170, 193 (Ind. Ct. App. 2008) (detective was questioned whether there was information about murder that only he knew, and his response, "Actually, there were three of us," which referred to Myers and another

detective, was conclusory statement of Myers's guilt and violated Rule 704(b)), *trans. denied*.[8]

Detective Ziegler never directly testified about her belief regarding Appellants' guilt or innocence, whether any allegations were true or false, or whether any witness testified truthfully, and she offered no legal opinion. Accordingly, we conclude that Detective Ziegler's testimony did not violate Indiana Evidence Rule 704.

## V. Prosecutorial Misconduct

During closing argument, the prosecutor made the following statements to the jury:

Go all the way. Do whatever it takes, be prepared to commit violence and that's where I want to talk about next. "I don't think we're going to see anything like this– we're not going to see anybody with twenty grand on them anytime soon. We've got to hit this guy and we've got to hit him hard and do whatever it takes." I will submit to you that go all the way – all the way only really means one thing, to kill him. But we didn't charge them with attempted murder.

….

"He gonna be a problem. He ain't gonna be no smooth." He's gonna be a problem. We're going to have to use violence. We're going to have to hurt him. We know they're prepared to do it, because he had a gun to do it and the ammunition. A 40 caliber bullet can do a lot of damage. It can do serious bodily injury, no doubt, and can kill somebody.

….

Guns – that's a violent instrument when used against a human being. The evidence clearly shows he was intending to use that against [S.M.] and that would cause serious harm ladies and gentlemen, serious bodily injury, no doubt. It may have even killed him. A bullet – as I said, you don't travel with your guns loaded until you're ready to use them. The opportunity didn't present itself to use it, but they were ready. They were ready. That bullet –

_____

[8] Appellants failed to provide pinpoint citations.

27

this magazine, full of ammunition, is found in that man's house, somewhat hidden above a piece of furniture. That bullet matches the same bullet in the bag at his feet. No doubt where it came from, no doubt whose it is. There the defendant is eyeing his prey.

Tr. at 417-18, 421, 423-24.

Appellants contend that the prosecutor's comments constituted misconduct. Generally, in order to properly preserve a claim of prosecutorial misconduct for appeal, a defendant must not only raise a contemporaneous objection but must also request an admonishment; if the admonishment is not given or is insufficient to cure the error, then the defendant must request a mistrial. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Appellants acknowledge that they did not object to the prosecutor's comments and therefore did not properly preserve their claims.

> To prevail on a claim of prosecutorial misconduct that has been procedurally defaulted, the defendant must establish not only the grounds for the prosecutorial misconduct, but also the additional grounds for fundamental error. In reviewing a claim of prosecutorial misconduct, we determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.

> Fundamental error is an extremely narrow exception to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue. For a claim of prosecutorial misconduct to rise to the level of fundamental error, it must make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process and present an undeniable and substantial potential for harm. The element of harm is not shown by the fact that a defendant was ultimately convicted. Rather, it depends upon whether the defendant's right to a fair trial was detrimentally

28

affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled.

*Neville v. State*, 976 N.E.2d 1252, 1258-59 (Ind. Ct. App. 2012) (citations and quotation marks omitted), *trans. denied* (2013).

Appellants argue that the prosecutor committed misconduct by suggesting that they might have murdered S.M. They rely on the legal principle that "[i]t is improper for counsel in argument to comment on matters not in evidence, and it is the duty of the trial court to see that they refrain from doing so." *Trice v. State*, 519 N.E.2d 535, 538 (Ind. 1988). They also cite Indiana Evidence Rule 103(c), which provides, "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."

Appellants assert that there was no evidence that they intended to murder S.M. To bolster their argument they cite *Gasper v. State*, 833 N.E.2d 1036, 1042 (Ind. Ct. App. 2005), *trans. denied*. In *Gasper*, a child molesting case, the prosecutor in closing argument stated that the washcloths admitted into evidence were covered with blood. The *Gasper* court concluded that the comment was misconduct because the record showed that "although the washcloths were admitted into evidence at trial, the State never determined that the substance covering them was blood." *Id*. at 1043.

This case is distinguishable from *Gasper* because here there was evidence supporting the prosecutor's statements. Ojile's statement that he was willing to "go all the way" could reasonably be interpreted to mean that he was willing to go so far as to kill S.M. in order to

29

take his money from him. The discovery of the gun and bullet in Ojile's backpack the following day further supports an inference that Appellants were willing to kill S.M. if need arose. "It is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence." *Hand v. State*, 863 N.E.2d 386, 394 (Ind. Ct. App. 2007). We conclude that the prosecutor did not comment improperly on matters not in evidence, and therefore his comments do not constitute misconduct.[9] There was no error, let alone fundamental error.

## VI. Ineffective Assistance of Ojile's Trial Counsel

Finally, Ojile claims that his attorney was ineffective for failing to assert a defense of abandonment at trial. We observe that

> post-conviction proceedings are usually the preferred forum for adjudicating claims of ineffective assistance of counsel. This is so because presenting such claims often requires the development of new facts not present in the trial record.
>
> Although a defendant may choose to present a claim of ineffective assistance of counsel on direct appeal, if he so chooses, the issue will be foreclosed from collateral review. … this rule would likely deter all but the most confident appellants from asserting any claim of ineffectiveness on direct appeal. It is no surprise that such claims based solely on the trial record almost always fail.

---

[9] We agree with Appellants that it is misconduct for a prosecutor to suggest that a jury convict a defendant for any reason other than his guilt by phrasing arguments in a manner calculated to inflame passions or prejudices of the jury. Erkins's Br. at 43; Ojile's Br. at 38 (citing *Limp v. State*, 431 N.E.2d 784, 788 (Ind. 1982)). We reject Appellants' argument that by discussing the harm that might have befallen S.M., the prosecutor was suggesting that the jury ought to convict them for some reason other than their guilt or innocence given that the State was required to prove that they intended and agreed to commit robbery resulting in serious bodily injury and had introduced evidence in support thereof.

*Rogers v. State*, 897 N.E.2d 955, 964-65 (Ind. Ct. App. 2008) (citations, quotation marks, and brackets omitted), *trans. denied* (2009).

Our standard of review for ineffective assistance claims is well settled:

When evaluating a claim of ineffective assistance of counsel, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth and Fourteenth Amendments. Second, the defendant must show that the deficient performance resulted in prejudice. To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

If a claim of ineffective assistance can be disposed by analyzing the prejudice prong alone, we will do so.

There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Benefield v. State*, 945 N.E.2d 791, 797 (Ind. Ct. App. 2011) (citations omitted).

Ojile contends that he and Erkins "voluntarily left the casino and went home without attempting or committing robbery of S.M.," and therefore, "[t]here was no strategic downside to arguing an abandonment defense when the evidence clearly suggested that Ojile voluntarily abandoned any alleged conspiracy to rob and injure S.M." Ojile's Br. at 44-45. We disagree.

31

In his closing argument, Ojile's counsel presented a lengthy and detailed argument that Appellants were tempted to and discussed the possibility of robbing S.M., but they never actually reached an agreement to follow through with it. Tr. at 399-403. Counsel's strategy is not unsound given the drawbacks of an abandonment defense under the facts of this case. First, asserting an abandonment defense essentially concedes the existence of a conspiracy. Second, Ojile's argument completely overlooks the evidence of an ongoing conspiracy contained in the Last Conversation. Third, abandonment must be voluntary. "To be considered voluntary, the decision to abandon must originate with the accused and not be the product of extrinsic factors that increase the probability of detection or make more difficult the accomplishment of the criminal purpose." *Munford v. State*, 923 N.E.2d 11, 18 (Ind. Ct. App. 2010) (quoting *Smith v. State*, 636 N.E.2d 124, 127 (Ind. 1994)). Here, Ojile left the casino just minutes before S.M. booked a room at the casino. The evidence supports a reasonable inference that Ojile left the casino due to extrinsic factors; namely, that S.M. was going to spend the night at the casino. We are unable to conclude that counsel's defense strategy fell below an objective standard of reasonableness. Accordingly, we conclude that Ojile did not receive ineffective assistance of trial counsel.

Affirmed.

KIRSCH, J., and MATHIAS, J., concur.